# Exhibit 1



**CT Corporation**
**Service of Process Notification**
08/29/2023
CT Log Number 544618079

## Service of Process Transmittal Summary

**TO:**    James Meyers
Kia Motors America, Inc.
111 PETERS CANYON RD
IRVINE, CA 92606-1790

**RE:**    **Process Served in Ohio**

**FOR:**    Kia America, Inc.  (Domestic State: CA)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Re: ANGELA FOX // To: Kia America, Inc. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Cuyahoga County Court of Common Pleas, OH<br>Case # CV23984319 |
| **NATURE OF ACTION:** | Product Liability Litigation - Personal Injury - 08/29/2022 |
| **PROCESS SERVED ON:** | C T Corporation System, Columbus, OH |
| **DATE/METHOD OF SERVICE:** | By Traceable Mail on 08/29/2023 postmarked: "Not Post Marked" |
| **JURISDICTION SERVED:** | Ohio |
| **APPEARANCE OR ANSWER DUE:** | Within 28 days after receiving this Summons (not counting the day you received it). |
| **ATTORNEY(S)/SENDER(S):** | Joseph F. Scott<br>SCOTT & WINTERS LAW FIRM, LLC<br>50 Public Square, Suite 1900<br>Cleveland, OH 44113<br>216-912-2221 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 08/30/2023, Expected Purge Date: 09/04/2023<br><br>Image SOP<br><br>Email Notification,  Debbie Avalos  davalos@kiausa.com<br><br>Email Notification,  Wendy Seeley  wseeley@kiausa.com<br><br>Email Notification,  Marisa Sanchez  msanchez@kiausa.com<br><br>Email Notification,  Samantha Hughes  shughes-contracted@kiausa.com<br><br>Email Notification,  Richard Holm  rholm@kiausa.com<br><br>Email Notification,  Jeremy Close  jclose@kiausa.com<br><br>Email Notification,  James Meyers  meyersj@kiausa.com<br><br>Email Notification,  John Y Yoon  jyoon@kiausa.com<br><br>Email Notification,  Olivia Poss  oposs@kiausa.com |



**CT Corporation**
**Service of Process Notification**
08/29/2023
CT Log Number 544618079

**REGISTERED AGENT CONTACT:**    C T Corporation System
4400 Easton Commons Way
Suite 125
Columbus, OH 43219
866-331-2303
CentralTeam1@wolterskluwer.com

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



**AIL** ®

US POSTAGE ™PITNEY BOWES

ZIP 44102 $ 009.10⁰
02 4W
0000367348 AUG 25 2023

NAILAH K. BYRD
1200 Ontario
Cleveland, OH 44113

Case# CV23984319

RETURN RECEIPT REQUESTED ELECTRONICALLY

9314 8001 1300 3548 6401 67

KIA AMERICA, INC.
STATUTORY AGENT, CT CORPORATION SYSTEM
4400 EASTON COMMONS WAY
SUITE 125
COLUMBUS OH 43219

## THE COURT OF COMMON PLEAS, CIVIL DIVISION
## CUYAHOGA COUNTY, OHIO
Clerk of Courts | The Justice Center | 1200 Ontario Street 1st Floor, Cleveland, Ohio 44113

<u>ANGELA FOX</u>
**Plaintiff**

V.

<u>KIA AMERICA, INC.</u>
**Defendant**

**CASE NO.** CV23984319

**JUDGE** NANCY A FUERST

# SUMMONS  SUMC  CM

**Notice ID:** 51468600

| From: | ANGELA FOX | P1 |
|---|---|---|
| | SCOTT & WINTERS LAW FIRM, LLC | |
| | 50 PUBLIC SQUARE, SUITE 1900 | |
| | CLEVELAND OH 44113 | |

| Atty.: | JOSEPH F SCOTT |
|---|---|
| | 50 PUBLIC SQUARE |
| | SUITE 1900 |
| | CLEVELAND, OH 44113 |

| To: | KIA AMERICA, INC. | D1 |
|---|---|---|
| | STATUTORY AGENT, CT CORPORATION SYSTEM | |
| | 4400 EASTON COMMONS WAY | |
| | SUITE 125 | |
| | COLUMBUS OH 43219 | |

### NOTICE TO THE DEFENDANT:

The Plaintiff has filed a lawsuit against you in this Court. You are named as a defendant. A copy of the **Complaint** is attached.

If you wish to respond to the Complaint, you must deliver a written **Answer** to the Plaintiff's attorney (or the Plaintiff if not represented by an attorney) at the above address *within 28 days* after receiving this Summons (not counting the day you received it). A letter or a phone call will not protect you. Civil Rule 5 explains the ways that you may deliver the **Answer** (http://www.supremecourt.ohio.gov/LegalResources/Rules/civil/CivilProcedure.pdf)

You must also file a copy of your **Answer** with this Court within 3 days *after* you serve it on the Plaintiff. You can file your **Answer** with the Clerk of Courts by one of the following methods: 1) In-person or by mail at the above address or 2) electronically through the online e-Filing system. For more information on using the e-Filing system, visit http://coc.cuyahogacounty.us/en-US/efiling.aspx.

If you fail to serve *and* file your **Answer**, you will lose valuable rights. The Court will decide the case in favor of the Plaintiff and grant the relief requested in the **Complaint** by entering a default judgment against you.

You may wish to hire an attorney to represent you. Because this is a civil lawsuit, the Court cannot appoint an attorney for you. If you need help finding a lawyer, contact a local bar association and request assistance.



**Nailah K. Byrd**
**Clerk of Court of Common Pleas**
**216-443-7950**

By_____
**Deputy**

**Date Sent:** <u>08/24/2023</u>

CMSN130



# Cuyahoga County Clerk of Courts
## Nailah K. Byrd

**Multilingual Notice:**

You have been named as a defendant in this Court. You must file an answer within 28 days; if you fail to answer, the Court may enter judgment against you for the relief stated in the Complaint. Seek assistance from both an interpreter and an attorney. Your inability to understand, write, or speak English will not be a defense to possible judgment against you.

1. **Spanish (US)**
   ***Aviso multilingüe:

   Este Tribunal lo ha declarado como acusado. Debe presentar una respuesta en un plazo de 28 días. Si no contesta en dicho plazo, el Tribunal podrá dictar sentencia en su contra por el amparo que se detalla en la demanda. Solicite la ayuda de un intérprete y de un abogado. Su incapacidad para comprender, escribir o hablar inglés no se considerará como defensa ante una posible sentencia en su contra.

2. **Somali**
   ***Ogeysiis luqadda badan ah:

   Waxaa laguu magacaabay sida eedeysane gudaha Maxkamadan. Waa in aad ku soo gudbisaa jawaab 28 maalmood gudahood; haddii aad ku guuldareysto jawaabta, Maxkamada laga yaabo in ay gasho xukun adiga kaa soo horjeedo ee ka nasashada lagu sheegay Cabashada. Raadi caawinta ka timid labadaba turjubaanka iyo qareenka. Karti la'aantaada aad ku fahmo, ku qoro, ama ku hadasho Af Ingiriisiga ma noqon doonto difaacida xukunkaaga suuralka ah ee adiga kugu lidka ah.

3. **Russian**
   ***Уведомление на разных языках:

   Вы были названы в качестве ответчика в данном суде. Вы должны предоставить ответ в течение 28 дней; если Ваш ответ не будет получен, суд может вынести решение против Вас и удовлетворить содержащиеся в жалобе требования. Воспользуйтесь услугами переводчика и адвоката. Тот факт, что Вы не понимаете английскую речь и не можете читать и писать по-английски, не является препятствием для возможного вынесения судебного решения против Вас.

4. **Arabic**
   ***ملاحظة متعددة اللغات:

   لقد تم اعتبارك مدعى عليه في هذه المحكمة. يجب أن تقدم ردا خلال 28 يوما؛ وإذا لم تقم بالرد، فقد تصدر المحكمة حكما ضدك بالتعويض المنصوص عليه في هذه الشكوى القضائية. اطلب المساعدة من مترجم فوري ومحام. فلن تعد عدم قدرتك على فهم اللغة الإنجليزية أو كتابتها أو تحدثها دفاعا لك أمام الحكم المحتمل ضدك.

5. **Chinese (Simplified)**
   ***多語版本通知：

   您在本法庭已被列为被告。您必须于 28 日内递交答辩状；如果没有递交答辩状，法庭会针对诉状中声明的补救措施对您作出不利判决。请向口译人员和律 师求帮助。您无法理解、书写或说英语的情况不能作为对您可能作出不利判决的辩护理由。

Justice Center, 1st Floor • 1200 Ontario Street • Cleveland, Ohio 44113-1664 • 216.443.7950

Ohio Relay Service 711 • Website: coc.cuyahogacounty.us



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed: COMPLAINT**
**August 22, 2023 11:42**

By: JOSEPH F. SCOTT 0029780

Confirmation Nbr. 2943489

ANGELA FOX                                          CV 23 984319

vs.

KIA AMERICA, INC.                          **Judge:**  NANCY A. FUERST

**Pages Filed:**  28

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| ANGELA FOX<br>c/o SCOTT & WINTERS LAW FIRM, LLC<br>Terminal Tower<br>50 Public Square, Suite 1900<br>Cleveland, OH 44113 | ) CASE NO.<br>)<br>) JUDGE<br>)<br>) <u>COMPLAINT</u><br>) |
| Plaintiff, | ) *(Jury Demand Endorse Hereon)*<br>) |
| v. | )<br>) |
| KIA AMERICA, INC.<br>C/O Statutory Agent,<br>CT Corporation System<br>4400 Easton Commons Way, Suite 125<br>Columbus, Ohio 43219 | )<br>)<br>)<br>)<br>) |
| Defendant. | )<br>) |

Now comes Plaintiff Angela Fox, by and through undersigned counsel, and for her

Complaint for damages against Kia America, Inc., states as follows:

## THE PARTIES

1.      At all times relevant hereto, Plaintiff Angela Fox was a resident of the City of

Avon Lake, Cuyahoga County, Ohio.

2.      Upon information and belief, Defendant Kia America, Inc. is a California

for profit corporation that maintains its principal place of business at 111 Peters Canyon Road,

Irvine, California, 92606. Defendant Kia America, Inc. is engaged in the business of testing,

developing, manufacturing, labeling, marketing, distributing, promoting, supplying and/or

selling, either directly or indirectly, through third parties and/or related entities, vehicles for

personal, commercial, and other use in the United States.

Electronically Filed 08/22/2023 11:42 / / CV 23 984319 / Confirmation Nbr. 2943489 / CLDLJ

3.      Defendant Kia America, Inc. is licensed to do business in the state of Ohio and has appointed its statutory agent as CT Corporation System located at 4400 Easton Commons Way Suite 125 Columbus OH 43219.[1]

4.      Defendant Kia transacted business and/or committed tortious acts within the state of Ohio. Defendant designed, manufactured, distributed, and/or sold dangerous and/or defective vehicles in Ohio. Defendant placed its defective vehicles and dangerous products into the stream of commerce, sold and/or supplied said products for use, used said products, and/or transacted business and committed tortious acts in Ohio from which Plaintiff's claims arise.

## BACKGROUND

5.      Plaintiff seeks to recover damages for devastating, catastrophic injuries she sustained in a motor vehicle accident that occurred on or about August 29, 2022 in the City of East Cleveland, Ohio. Plaintiff was the victim of a public nuisance created by Defendant Kia America, Inc. ("Kia") through its manufacture and sale of defective vehicles. Specifically, Defendant manufactured and sold vehicles that were easy to steal, including the Kia Sportage that was being driven by a car thief and injured Plaintiff. By its affirmative acts to put profits ahead of safety, Kia disregarded industry safety standards and produced vehicles that failed to meet National Highway Transportation Safety Administration ("NHTSA") safety standards, including, but not limited to, Federal Motor Vehicle Safety Standard 114. The defects created a public nuisance that interfered with Plaintiff's, and other members of the public's, health, welfare, and safety.

6.      The design flaws in Defendant's vehicles such as the Kia Sportage involved in the collision with Plaintiff on August 29, 2022, allow thieves to steal a Kia vehicle in less than ninety seconds. The design flaws in these vehicles include: (i) the steering columns do not contain

---

[1] https://businesssearch.ohiosos.gov?=businessDetails/FC1464 (last accessed Aug. 21, 2023).

adequate secure collars or casings, and thereby, allow easy access to the ignition assembly; (ii) the ignition lock cylinders do not have a locking mechanism and can be easily removed with minimal force, and in so doing, leaves the ignition switch intact; (iii) the exposed ignition switch can be started with any set of pliers, or the current generation of thieves' tool of choice, a USB connector; and (iv) Defendant's vehicles, such as the Kia Sportage involved in the collision with Plaintiff, do not contain engine immobilizers. Indeed, with respect to Plaintiff Fox, a car thief was able to take advantage of the defects in the Kia Sportage to peel back the steering column casing and easily access the ignition. Thereafter, the thief was easily able to quickly start the vehicle without a key.

7. There is an inextricable link between preventing vehicle theft and protecting public safety. Making sure cars are not easy to steal both protects property and protects the public by keeping dangerous drivers in stolen vehicles off the roads. This case is a clear example of what happens when a car manufacturer cannot be bothered to follow federal safety standards for including anti-theft technology in its cars.

8. The days of "hotwiring" cars with nothing more than a screwdriver are largely over – in most automobiles, the ignition key emits a radio signal that prompts a computer to disengage an immobilizer device and allows the car to move when the key is present. Kia models are a glaring exception.

9. While other car manufacturers were incorporating immobilizer technology to ensure that car ignitions could not be started without keys, Defendant Kia America, Inc. failed to do so in the United States. As a result, TikTok and news videos teaching the relative ease with which Kia vehicles could be stolen have gone viral. In many cases, the thieves use tools no more advanced than a USB cable. Kia's decision to reduce costs, and thereby, boost profits, by foregoing common anti-theft technology has resulted in an epidemic of thefts of Kia vehicles.

This vehicular crime wave has had a significant impact on public safety in the greater Cleveland metropolitan area as well as across the country.

10.     In the 1960s and 1970s, all that was needed for a successful vehicle heist was a little brute force (to crack open the ignition column) and a key shaped object to start the car and drive off in seconds. Kia failed to install vehicle immobilizers in most of their cars sold in the United States despite installing such technology in vehicles produced and sold in the European and Canadian markets.

11.     As early as 1968, the Department of Transportation and the Department of Justice concluded that amateur thieves stealing cars to go joy-riding make up a significant portion of all auto thefts in America. Moreover, these thieves can steal cars using simple means, such a pair of pliers to remove the ignition lock. That is why simple measures such as the installation of an immobilizer are so effective at preventing the majority of auto thefts.

12.     Kia's decision to put cost-savings and profits over public safety has had devastating consequences to the greater Cleveland metropolitan area and its residents, as in other cities. The failure of Kia to install industry-standard anti-theft devices, notwithstanding decades of academic literature and research supporting the deterrent effects of such technology, has opened the floodgates to vehicle theft, crime sprees, reckless driving, and public harm.

13.     The epidemic started in Milwaukee before spreading nationwide.[2] By June 2021, the Milwaukee Police Department reported that the theft of Kia and similarly manufactured

---

[2] "Police warn of rise in car thefts of two particular car brands. Is yours one of them?" Cincinnati Enquirer (June 30, 2022) [https://www.yahoo.com/entertainment/police-warn-rise-car-thefts-001032746.html] (last accessed Aug. 21, 2023).

vehicles had increased by 2,500% since the previous year, with an average of 16 cars being stolen per day.[3]

14.     The epidemic of vehicle thefts was spurred on by a viral TikTok challenge started in 2021.[4] Videos demonstrating the ease by which Kia vehicles could be stolen were also posted on YouTube. As a result, Midwest cities like Chicago experienced and 800% increase year-on-year in the theft of these cars for the month of August 2022.[5]

15.     In Lakewood, Ohio, where the Kia Sportage involved in Plaintiff's accident was stolen, the City of Lakewood experience an almost 100% increase in stolen vehicles in 2022. The increase was due to vehicles that were manufactured without standard anti-theft devices, such as Kia vehicles.[6] As noted by Lakewood Police Chief Kevin Kaucheck, "[t]hose [motor vehicle thefts] are the result of the TikTok challenge where they showed people how to start Kias and Hyundais without a key and steal them."[7] "It's frightening to think (about) these kids, whether they're being chased or just driving 80 mph on a side street just for fun. **It's very dangerous and unfortunate the car companies didn't foresee this issue years ago.**"[8]

---

[3] "Thefts of Kia, Hyundai explode 2,500% in Milwaukee." WISN (June 17, 2021) [https://www.wisn.com/article/thefts-of-kia-hyundai-explode-2500-in-milwaukee/36756668] (last accessed Aug. 21, 2023).
[4] 'Public nuisance': New York sues Hyundai and Kia, alleging their cars are easy to steal (cnbc.com) [https://www.cnbc.com/2023/06/07/public-nuisance-hyundai-kia.html?&qsearchterm=kia%20thefts] (last accessed Aug. 21, 2023).
[5] Id.
[6] Lakewood Police Department's 2022 report reveals increase in motor vehicle thefts - Cleveland.com [https://www.cleveland.com/community/2023/03/lakewood-police-departments-2022-report-reveals-expected-increase-in-motor-vehicle-thefts.html#:~:text=LAKEWOOD%2C%20Ohio%20--%20Crime%20increased%20in%20Lakewood%20during,without%20a%20key%20and%20steal%20the m%2C%E2%80%9D%20he%20noted.] (last accessed Aug. 21, 2023).
[7] Id.
[8] Id. (emphasis added).

16.     In neighboring Cleveland, Ohio, the Cleveland Police Department was seeing a dramatic increase in Kia motor vehicle thefts by August 2022.[9]

17.     The TikTok videos detailed how easily Kia vehicles could be stolen. As the videos detailed, an individual need only remove the plastic cowl under the steering column and use a USB cable to start these unsecure cars. The Kia Sportage involved in Plaintiff's accident was stolen in this same manner.

### Car Thefts Imperil Public Safety

18.     Car thefts imperil public safety. By creating a rash of car thefts, Defendant is responsible for a substantial risk to public safety.

19.     This is the conclusion drawn by the NHTSA. Operating under what was formerly known as the National Traffic Safety Bureau, NHTSA promulgated Federal Motor Vehicle Safety Standard ("FMVSS") No. 114 to reduce the instances of car thefts, because "stolen cars constitute a major hazard to life and limb on the highways."[10] The NHTSA concluded that the "evidence shows that cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[11] The NHTSA Administrator concluded that "a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety," by reducing both injuries and deaths to would-be car thieves, and by "protect[ing] the many innocent members of the public who are killed and injured by stolen cars each year."[12]

---

[9] See, e.g., "Criminal charges against two 14-year-olds underscore Cuyahoga County's Kia, Hyundai theft problem" – Cleveland.com [https://www.cleveland.com/court-justice/2023/02/criminal-charges-against-two-14-year-olds-underscore-cuyahoga-countys-kia-hyundai-theft-problem.html] (last accessed Aug. 21, 2023).

[10] See 33 Fed. Reg. 6,471 (April 27, 1968) [https://archives.federalregister.gov/issue_slice/1968/4/27/6469-6472.pdf#page=3] (last accessed Aug. 21, 2023).

[11] Id.

[12] Id.

20.    Sadly, the reverse is true as well. An increase in the incidence of automobile theft results in a substantial decrease in public safety. Defendant Kia's pursuit of profits over theft-prevention led to a meteoric rise in automobile thefts and the concomitant threats to public safety. Car theft results in reckless driving, as occurred on August 29, 2022 when Plaintiff was severely injured by the driver of a stolen Kia Sportage as he attempted to flee from police.

21.    Reckless driving threatens the comfortable enjoyment of life, health, and safety of the public throughout the Greater Cleveland Metropolitan area. Distinct from many instances of car theft, where the object is converting the stolen vehicle, the viral "Kia challenge" typically involves joyriding and then abandoning the stolen vehicles. Far from surreptitiously delivering a car to a chop shop under cover of night, the social phenomenon, made possible by Defendant's unsecure vehicles, led to youth posting videos of reckless driving during busy hours of the day, and then abandoning the vehicles after collisions.

*The NHTSA Has Promulgated Anti-Theft Measures For Car Manufactures*

22.    In 1966, Congress passed the National Traffic and Motor Vehicle Safety Act (the "Safety Act"), with the aim of administering new motor vehicle and traffic safety standards.[13] Administration of the Safety Act was overseen by the newly created Department of Transportation through its sub-agency: NHTSA, f/k/a the National Traffic Safety Bureau.

23.    Pursuant to its statutory authority under the Safety Act, NHTSA promulgated numerous Federal Motor Vehicle Safety Standards ("FMVSS"). Among these standards, FMVSS 114[14] requires minimum theft-protection standards for nearly all passenger vehicles in the United States:

---

[13] P.L. 89-563, 80 Stat. 718.
[14] 49 C.F.R. § 571.114.

S1. *Scope.* This standard specifies vehicle performance requirements intended to reduce the incident of crashes resulting from theft and accidental rollaway of motor vehicles.

S2. *Purpose.* The purpose of this standard is to decrease the likelihood that a vehicle is stolen, or accidentally set in motion.

S3. *Application.* This standard applies to all passenger cars, and to trucks, and multipurpose passenger vehicles with GVWR of 4,536 kilograms (10,000 pounds) or less.

...

S5.1. Theft Protection. Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents:

(a)     The normal activation of the vehicle's engine or motor; and

(b)     Either steering, or forward self-mobility, of the vehicle, or both.

...

S5.2.2 Except as specified in S5.2.4, the vehicle must be designed such that the transmission or gear selection control cannot move from the "park" position, unless the key is in the starting system.

24.     A main motivation for creating FMVSS 114 was NHTSA's recognition "that stolen cars constitute a major hazard to life and limb on the highways. The evidence shows that stolen cars are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[15]

25.     As early as 1966, studies showed "there were an estimated 94,000 stolen cars involved in accidents"—with "18,000 of these accident result[ing] in injury to one or more people."[16] Accordingly, the NHTSA recognized that "a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety " and "protect the many innocent

---

[15] 33 Fed. Reg. 6,471 (April 27, 1968) [https://archives.federalregister.gov/issue_slice/1968/4/27/6469-6472.pdf#page=3] (last accessed Aug. 21, 2023).
[16] *Id.*

members of the public who are killed and injured by stolen cars each year."[17] To address this safety risk, which is largely tied to "car thieves who could bypass the ignition lock...the agency decided to require a device, which would prevent either self-mobility or steering even if the ignition lock were bypassed."[18]

26.  An engine immobilizer satisfies this requirement, "because it locks out the engine control module if an attempt is made to start the vehicle without the correct key or to bypass the electronic ignition system."[19]

27.  In the late 1980s and early 1990s, vehicle theft increased dramatically in the United States.[20] The common method for stealing a car involved bypassing the motor's ignition switch, otherwise known as "hotwiring".

28.  To respond to this growing problem, manufacturers began installing passive vehicle immobilizers, which were patented no later than 1993.[21]

29.  The invention proved successful and, less than five years later, the European Union mandated that all new passenger cars from 1998 forward be equipped with an electronic engine immobilizer.[22] Similar mandates soon followed in Australia, New Zealand, and Canada.

---

[17] *Id.*

[18] 71 Fed. Reg. 17752 (April 7, 2006) [https://www.federalregister.gov/documents/2006/04/07/06-3358/federal-motor-vehicle-safety-standards-theft-protection] (last accessed Aug. 21, 2023).

[19] NHTSA Interpretation GF005229-2 (Sept. 24, 2004) [https://www.nhtsa.gov/interpretations/gf005229-2] (last accessed Aug. 21, 2023).

[20] Anthony Dixon & Graham Farrell, Age-period-cohort effects in half a century of motor vehicle theft in the United States, 9 CRIME SCIENCE 17, 1, 3, (2020) [https://crimesciencejournal.biomedcentral.com/articles/10.1186/s40163-020-00126-5] (last accessed Aug. 21, 2023).

[21] Int'l Patent Publication No. WO 93/13968 (filed Jan. 7, 1993).

[22] *See* Commission Directive No. 95/96EC, 1995 O.J. (L286) (amending Council Directive 74/61/EEC to require the installation of immobilizers and alarm systems in motor vehicles beginning in October 1998) [https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:31995L0056&from=LV] (last accessed Aug. 21, 2023).

30.     As engine immobilizers became the industry-standard among manufacturers, at least one study in the Netherlands suggested that immobilizers "lowered the overall rate of car theft on average by about 40 percent during 1995-2008."[23]

31.     At the turn of the 21st century, automatic engine immobilizers were considered quintessential anti-theft technology by the majority of car manufacturers in America with the exception of Kia and Hyundai Motor America.

32.     Studies by the Highway Loss Data Institute ("HLDI") showed "that vehicle theft losses decreased significantly after factory-installed passive immobilizing anti-theft devices were introduced."[24]

33.     In a 2013 NHTSA report regarding the drop in the vehicle theft rate from 1993 through 2011, the NHTSA noted that it "believes that the theft rate reduction is a result of several factors, including vehicle parts marking; the increased use of standard antitheft devices and other advances in electronic technology (i.e. immobilizers) and theft prevention methods; increased and improved prosecution efforts by law enforcement organizations; and , increased public awareness which may have contributed to the overall reduction in vehicle thefts." 78 Fed. Reg. 41,016, 41, 017 (July 9, 2013).

34.     Studies of which Defendant Kia as a prudent car manufacturer should have been aware of, conducted by the HLDI similarly found that "vehicle theft losses plunged after immobilizers were introduce." [25]

---

[23] Jan C. van Ours & Ben Vollaard, *The Engine Immobiliser; A Non-Starter for Car Thieves*, 126 THE ECONOMIC JOURNAL 593, 1264, 1283 (June 2013).
[24] Hyundai and kia theft losses," 38 HLDI BULLETIN 28 (December 2021) [https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf] (last accessed Aug. 21, 2023).
[25] "Hyundais, Kias are easy targets amid boom in vehicle thefts" – Insurance Institute for Highway Safety (Sept. 22, 2022) [https://www.iihs.org/news/detail/hyundais-kias-are-easy-targets-amid-boom-in-vehicle-thefts] (last accessed Aug. 21, 2023).

35.     The National Insurance Crime Bureau ("NICB"), an organization dedicated to fighting insurance fraud and crime, noted in a 2013 report concerning auto thefts that a reduction in vehicle thefts requires an immobilizer. The NCIB put it simply: "[g]enerally speaking, if your vehicle can't be started, it can't be stolen."[26]

36.     A study conducted by the Highway Loss Data Institute ("HLDI") noted that "Hyundai and Kia have lagged behind other manufacturers in equipping their vehicles with standard passive immobilizers; for example, only 26 percent of their 2015 vehicle series were equipped with standard immobilizers compared with 96 percent of all other makes combined. This lack of an immobilizer has made many Hyundai and Kia vehicles vulnerable to theft."[27]

37.     Despite decades of research and findings that immobilizers significantly reduced vehicle theft and the consequential public safety risks, Defendant Kia continued to fail to install immobilizers on all of its passenger vehicles, including the 2022 Kia Sportage involved in Plaintiff's August 29, 2022 accident.

38.     In or around 2020, a group of teenagers in Milwaukee, who dubbed themselves the "Kia Boyz," discovered the security defects in Kia's automobiles and began to publicize precisely how to take advantage of Defendant's theft prone vehicles and steal one in a matter of seconds.

39.     *First*, the thieves recognized that the vast majority of Kia vehicles on the road do not have an engine immobilizer. The thieves are easily able to identify the theft prone vehicles

---

[26] "'Hot' Wheels" – National Insurance Crime Bureau
[https://www.imtins.com/business/hot_wheels.php] (last accessed Aug. 21, 2023).
[27] "Hyundai and Kia theft losses" – Highway Loss Data Institute, Vol. 38, No. 28: December 2021
[https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf] (last accessed Aug. 21, 2023).

because, upon information and belief, each Kia vehicle sold with a traditional "insert-and-turn" key ignition systems, as opposed to "push-to-start" ignition, lacks an immobilizer.

40.    *Second*, the thieves discovered that these Kia vehicles do not contain alarms or sensors attached to the windows, which allows them to enter the vehicles without drawing attention to themselves.

41.    *Third*, once they stealthily entered the vehicles, the thieves found that the steering columns in Defendant's theft prone vehicles do not contain adequate casing or a hardened collar, and are, therefore, easily pulled off.

42.    *Fourth*, the thieves realized that the ignition lock assembly, which contains the lock cylinder, is easily disassembled with a screwdriver or with minimal force, thereby exposing the ignition switch.

43.    *Fifth*, in a truly modern take on a decades old technique to steal a car, these thieves found that the ignition switch fits perfectly into the end of a USB cable, which has become ubiquitous in vehicles today, and can start with a simple twist. While the USB cable end is frequently used, any set of pliers works just as well. Once the ignition switch is turned and the vehicle starts, the steering lock is disengaged.

44.    The simple steps detailed above can be completed by a complete novice thief in less than ninety seconds.

45.    Defendant Kia manufactured, sold, and distributed vehicles that did not comply with FMVSS 114, including the Kia Sportage involved in the collision with Plaintiff, because the vehicles do not contain a meaningful anti-theft device, such as an engine immobilizer or other effective anti-theft features that prevent the normal activation of the vehicle's engine without a valid key. Consequently, those vehicles, including the Kia Sportage involved in Plaintiff's

collision, do not contain starting systems that prevent forward self-mobility of the vehicle when the key is removed.

46.     Steering columns come in a variety of forms, but what they have in common is that they are a piece of metal, or an equally durable material, that locks around the steering column, covering the ignition lock assembly, so that the ignition cylinder cannot be accessed. Because the collar prevents thieves from accessing the ignition cylinder, it's virtually impossible to "hot-wire" a vehicle, even without an immobilizer.

47.     But Defendant Kia ignored the NHTSA's guidance and installed unsecure, flimsy plastic steering column covers in its vehicles, including the Kia Sportage involved in the collision with Plaintiff.

48.     The flimsy steering column cover Defendant used in its vehicles, including the Kia Sportage involved in Plaintiff's collision, are easily torn apart, allowing a thief to quickly and easily access the ignition assembly and start the vehicle.

49.     The flaws in Defendant's vehicles, including the Kia Sportage involved in Plaintiff's collision, include Defendant's defective design and manufacture of the ignition lock assemblies.

50.     The ignition lock assembly in Defendant's theft prone vehicles, including the Kia Sportage involved in Plaintiff's collision, is attached to the vulnerable steering column.

51.     The ignition assembly is designed to work as follows. A key is inserted into the lock cylinder, which only fits the correct key. When the correct key is inserted, small actuators in the lock cylinder match up with the key and allow the driver to turn the cylinder. The lock cylinder has a "female" port at the end of the component that connects to the ignition switch's external "male" connector, referred to as a "spade." When the cylinder turns, the female port turns the ignition switch's spade thereby starting the vehicle.

52.     Thieves realized decades ago that they do not need to turn the cylinder in order to start a vehicle's engine. Instead, they only need to rotate the vehicle's ignition switch. If you can easily remove the cylinder, the switch can be turned by using any pair of pliers, a USB connector, or even one's bare hands.

53.     Although some other manufacturers also install their ignition assemblies within or attached to the steering column, they ensure that the ignition cylinder and switch are not easily exposed and bypassed.

54.     Among the various designs that accomplish this is by placing the ignition cylinder behind the steering wheel. This requires the entire steering wheel to be removed in order to access the cylinder, which is a difficult task that requires specific knowledge of how each vehicle's steering column and wheel is designed, takes considerable time, and is hard to accomplish surreptitiously.

55.     Other manufacturers design the cylinder so that it can only be removed from the ignition assembly, thereby exposing the ignition switch, that will only engage if a hidden release mechanism (the "pin," which requires special curved tools), is engaged. Other manufacturers fully engrain the ignition cylinder within a metal housing, which can only be removed by drilling a hole into the cylinder and completely destroying the component.

56.     Defendant Kia did not implement *any* of these safeguards for the ignition switches installed in its theft prone vehicles, including the Kia Sportage involved in the collision with Plaintiff. After a thief removes the steering column cover – which, again, has no protective lock or hardened material – the ignition cylinder is exposed. Once the thief has access to the ignition cylinder, the cylinder's release pin is in plain sight and requires no special tools to be removed while preserving the ignition switch.

57.     Thieves have found that they do not even need to bother using a screwdriver to trigger the lock cylinder's release pin. Instead, they can simply pry the lock cylinder from the ignition assembly. Given the weak plastic housing present in Defendant's vehicles, such as for example the Kia Sportage involved in Plaintiff's collision, thieves can jam a screwdriver into the lock cylinder and shake the component until the cylinder's release pin slips out of the casing hole. This method works just as well triggering the pin from the outside of the cylinder and similarly does not damage the ignition switch.

58.     At that point, once the cylinder is removed the intact ignition switch is exposed, and any set of pliers, a USB cable, or one's bare hands can rotate the switch to start the engine.

59.     While Defendant may claim that its theft prone vehicles contain an ostensible steering lock, the series of design and/or manufacturing flaws above renders the device worthless. As its name implies, steering locks prevent someone from turning the steering wheel when the engine is turned off. The steering lock is designed to disengage once the ignition switch is turned. Consequently, the purported steering lock is totally ineffective, as anyone can easily neutralize the lock with a USB cable.

60.     Defendant may claim that the presence of their steering lock satisfies FMVSS No. 114, which sets forth minimal performance standards. But Defendant's useless "steering lock" neither prevents "steering" or "forward self-mobility" of its theft prone vehicles, including the Kia Sportage involved in Plaintiff's collision, when the key is removed.

61.     A modern car alarm system consists of: (i) sensors; (ii) a siren or speaker; (iii) a radio receiver; (iv) an alarm control unit; and (v) an auxiliary battery.

62.     There are many types of sensors attached to the alarm system. The door sensor is the most common and foundational. When a door, the hood, or the trunk is opened the sensor is triggered and sends a signal to the control unit.

63.     Because opening a door is just one way among many of entering a locked car, modern alarm systems also include shock sensors. Shock sensors, as its name implies, are triggered when somebody hits, jostles or otherwise physically moves the vehicle.

64.     The final sensors that are typically used to prevent window intrusions are "window" and "pressure" sensors. These sensors are critical because breaking into a car through a window is very common.

65.     Window sensors are usually made up of a microphone installed in the vehicle that is triggered when it detects the sound of glass breaking. Breaking glass produces a distinctive sound frequency, so it is easy to identify.

66.     Pressure sensors are another way of detecting unauthorized entry into the vehicle. When a window glass is broken or a door is opened, the air pressure within the vehicle fluctuates. The pressure sensor is triggered when it detects this change in air pressure.

67.     When a sensor is triggered, it will send a signal to the alarm system's radio receiver and/or the alarm control unit. The control unit is like a miniature computer that monitors all the sensors, speakers, and radio receiver and is the "brain" of the system. If the control unit receives a signal from one of the sensors, it will sound an audible alarm that is recognizable to bystanders and, typically, distinct for each vehicle. The control unit may also send a signal to flash the headlights. Once the siren sounds the owner or authorized driver of the vehicle can use a key fob to communicate with the radio receiver that interacts with the alarm control unit.

68.     The alarm system primarily relies on the vehicle's main 12-volt battery, but it also has an auxiliary battery so that it remains functional even when the main battery dies or is disconnected.

69.     Upon information and belief, the alarm system designed and installed into Kia's theft prone vehicles, including the Kia Sportage involved in Plaintiff's collision, is deficient because the alarm is not triggered when one or more of the windows are shattered, which is how many thieves enter the vehicle.

70.     Upon information and belief, Defendant failed to install pressure sensors and/or one or more of these additional (low cost) design features in its vehicles, including the Kia Sportage involved in the collision with Plaintiff. Rather, upon information and belief, the theft prone Kia was equipped with a basic door alarm system, which allowed the thief to enter the vehicle by smashing a window and climbing inside and quickly and easily starting the vehicle.

71.     After considerable public outcry and scrutiny, in 2022, Defendant Kia slowly began to acknowledge that its vehicles suffered from defects that made them theft prone, and therefore, are easily stolen. But as detailed below, Defendant has known or should have known of the defects rendering its vehicles theft prone long before it sold the first with those design and manufacturing defects.

72.     Upon information and belief, Defendant was aware of the design and manufacturing defects that rendered its vehicles theft prone, including the Kia Sportage involved in the collision with Plaintiff, and the safety risk it posed to Plaintiff and other members of the general public, through the following sources, including, but not limited to their (1) presale testing and Safety Standards self-certification process for those vehicles; (2) analyses and usage of engine immobilizers in other vehicles manufactured by Defendant, its PMP petitions, and usage of engine immobilizers in similar vehicles manufactured by Defendant Kia and sold outside the U.S. market; (3) monitoring of vehicle thefts for vehicles manufactured by Defendant; and (4) monitoring of customer complaints, dealership records, warranty claims, and replacement parts orders.

73. Defendant is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Defendant was aware of applicable Safety Standards, including FMVSS No. 114.

74. Under 49 U.S.C. § 30115, Defendant is required to certify that each of its vehicles "complies with applicable motor vehicle safety standards."

75. Upon information and belief, Defendant employs consultants and engineers that are knowledgeable of FMVSS No. 114 and who are involved in the design, manufacturing, and testing of Defendant's vehicles, including those manufactured without industry-standard safety measures as described above, prior to sale to ensure compliance with the Safety Standard.

76. Upon information and belief, Defendant also conducts pre-sale tests to verify the parts are free from defects and align with their specifications.

77. Defendant Kia conducts expansive presale testing on its vehicles to make sure they "endure over a long time without fault."[28] Kia states that it conducts "performance and durability tests" on "all Kia vehicles sold in the U.S." at the California Proving Ground.[29]

### FIRST CAUSE OF ACTION
#### *Common Law Absolute Public Nuisance*

78. Plaintiff incorporates each preceding paragraph as fully rewritten herein.

79. A "public nuisance" is an unreasonable interference with a right common to the general public, including the rights to public health and public safety.

80. Defendant's conduct constitutes a public nuisance that threatened the safety, welfare, and comfort of Plaintiff and other area residents.

---

[28] https://www.kia.com/fj/experience/innovation-story/performance.Kappa.html (last accessed Aug. 21, 2023).
[29] Kia Motors 2017 Annual Report, p.36. [https://worldwide.kia.com/int/company/ir/archive/annual-report/download/B200002757/F200012579] (last accessed Aug. 21, 2023).

81.     Defendant created and maintained a public nuisance by manufacturing and distributing automobiles that were dangerously susceptible to theft, including the Kia Sportage that injured Plaintiff, thus interfering with the public safety, health, and welfare of Plaintiff and other area residents. Plaintiff and other area residents had a right to be free from such conduct and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

82.     On August 29, 2022, East Cleveland police officers engaged in a high-speed pursuit of a stolen 2022 Kia Sportage automobile. The vehicle was being operated by Jayshan Vance who was 19 years old at the time. Vance had stolen the vehicle from a residence in nearby Lakewood Ohio by taking advantage of the Kia's lack of proper anti-theft protection –including an engine immobilizer and other industry-standard anti-theft measures as outlined above.

83.     The pursuit reached speeds of in excess of 90 MPH. Ultimately, the pursuit terminated in a multi-vehicle collision near the intersection of St. Clair Avenue and Eddy Road in East Cleveland, Ohio, which included Plaintiff Fox's vehicle.

84.     Plaintiff Fox sustained severe, catastrophic injuries as a result of the collision. To date, Plaintiff Fox has undergone multiple surgical procedures and incurred hundreds of thousands of dollars in medical bills. She has endured tremendous pain and suffering and mental anguish as a result of her injuries and the myriad of medical procedures and treatments she has had to endure. Many of her injuries are believed to be permanent and nature and will continue to cause her great pain and suffering, medical expense, and other financial loss well into the future.

85.     Defendant Kia's conduct directly caused the public nuisance and was directly and proximately responsible for the ensuing collision and Plaintiff's injuries.

86.     The nuisance created by Kia was an absolute public nuisance because Defendant's nuisance creating conduct was intentional and violated FMVSS 114, which established specific legal requirements for the protection of others.

87.     FMVSS 114 requires automobiles to have a starting system which, whenever the key is removed from the starting system prevents "[e]ither steering, or forward self-mobility, of the vehicle, or both" and for vehicles to be designed "such that the transmission or gear selection control cannot move from the 'park' position, unless the key is in the starting system."[30]

88.     As alleged above, nearly all cars – except those of Kia/Hyundai – in the United States satisfy FMVSS 114 through the installation of an engine immobilizer. Defendant's failure to include an engine immobilizer, or a substitute system capable of satisfying FMVSS 114, violates the law.

89.     Defendant knew that its conduct had caused an increase in vehicle thefts.

90.     It was reasonably foreseeable that Defendant's actions and omissions would result in the public nuisance and harm Plaintiff and other area residents.

91.     The public nuisance created by Defendant was substantial and unreasonable. Defendant's actions caused significant physical, mental and emotional harm to Plaintiff. Many of her injuries are permanent in nature and will require ongoing and future medical treatment and care. She will continue to suffer and experience a loss of enjoyment due to her injuries.

92.     The harm suffered by Plaintiff by virtue of Defendant's conduct is different than the harm suffered by the general public. Plaintiff has and will incur expenditures for medical treatment not incurred by the general public. Plaintiff will incur pain and suffering not incurred by the general public. Plaintiff will incur loss of income and enjoyment of life not incurred by the

---

[30] 49 C.F.R. § 571.114.

general public. Plaintiff will continue to incur these expenses and other injuries into the future –
unlike the general public.

## SECOND CAUSE OF ACTION
### *Common Law Qualified Public Nuisance*

93.     Plaintiff incorporates each of the preceding paragraphs as if fully rewritten
herein.

94.     Defendant Kia created and maintained a public nuisance by manufacturing and
distributing automobiles, including the Kia Sportage that injured Plaintiff, that were
dangerously susceptible to theft, thus interfering with the public health, welfare, and safety of
Plaintiff and other area residents. Plaintiff and other area residents have a common right to be
free from such conduct and to be free from conduct that creates a disturbance and reasonable
apprehension of danger to persons and property.

95.     The public nuisance is a qualified public nuisance because Defendant negligently
engaged in conduct or omissions which endangered or injured the health, safety, or comfort of
Plaintiff and other area residents.

96.     Defendant had a duty to exercise ordinary care and/or reasonable care in the
design, research, development, manufacture, testing, sale, and distribution of their vehicles into
the stream of commerce, including a duty to exercise care to assure that the vehicles were safe
and equipped with industry-standard anti-theft measures.

97.     At all times relevant to this litigation, Defendant knew or, in the exercise of
reasonable care, should have known of the hazards and dangers of foregoing installation of
engine immobilizers, as well as other industry-standard anti-theft measures, increased risk of
vehicle theft and public harm.

98.     Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that the omission of an engine immobilizer and other industry standard anti-theft measures could cause injuries and thus created a dangerous and unreasonable risk of injury to Plaintiff and other area residents.

99.     Defendant, by action and inaction, breached its duty and failed to exercise reasonable care, and failed to act as a reasonably prudent person and/or company would act under the same circumstances in the design, research, development, manufacture, testing, sale, and distribution of its vehicles, in the Defendant manufactured vehicles that fell below minimum industry-standard security measures.

100.    Defendant is liable for creating a public nuisance because of its intentional and unreasonable conduct.

101.    As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff has suffered severe, catastrophic physical injuries. She has suffered physical pain and mental anguish. Many of her injuries are permanent in nature and will require ongoing and future medical care and treatment.

102.    The injuries and harm suffered by Plaintiff are unique and different that any injury suffered by the general public by virtue of the public nuisance created by Defendant. The physical injuries and related medical expenses and financial losses suffered by Plaintiff as a result of Defendant's public nuisance have not been incurred by the general public. The physical pain and mental anguish incurred by Plaintiff as a result of Defendant's public nuisance have not been incurred by the general public. Moreover, the future medical care and treatment, together with the related financial expenses and physical and mental pain, as a direct and proximate result of Defendant's public nuisance, will not be incurred by the general public.

## THIRD CAUSE OF ACTION
### *Negligence*

103.    Plaintiff incorporates each of the preceding paragraphs as if fully rewritten herein.

104.    At all times relevant to this litigation, Defendant Kia had a duty to act as a reasonably prudent person and/or company would act under the circumstances in the design, research, manufacture, sale, and distribution of Defendant's products, including the duty to take all reasonable steps necessary to prevent the manufacture and/or sale of a product that was so unreasonably capable of being engine activated and operated without a key in the starting system as was the Kia Sportage that injured Plaintiff.

105.    Defendant owed a duty to Plaintiff to not expose her to an unreasonable risk of harm.

106.    Defendant's duties were preexisting.

107.    At all times relevant to this litigation, Defendant knew, or in the exercise of reasonable care, should have known of the hazards and dangers of foregoing installation of an engine immobilizer, as well as other industry-standard anti-theft measures, in its vehicles, and specifically, the increased risk of vehicle theft and public harm by failing to include such industry-standard anti-theft measures.

108.    Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that the omission of an engine immobilizer, as well as other industry-standard anti-theft measures, in its vehicles, including the Kia Sportage that injured Plaintiff, could cause injuries and thus created a dangerous and unreasonable risk of injury to Plaintiff.

109.     Defendant, by action and inaction, breached its duty and failed to exercise reasonable care, and failed to act as a reasonably prudent person and/or company would act under the same circumstances in the design, research, development, manufacture, testing, sale, and distribution of its vehicles, including the Kia Sportage that injured Plaintiff, in that Defendant manufactured and produced vehicles that fell below minimum industry-standard security measures.

110.     At all times relevant to this litigation, Defendant Kia was in control of the design, research, manufacture, testing and distribution of its vehicles, including the Kia Sportage that injured Plaintiff, that were distributed to authorized dealerships.

111.     Defendant knew or should have known that it was foreseeable that other motorists lawfully using the public streets, such as Plaintiff, would suffer injuries as a result of Defendant's failure to exercise reasonable care in the manufacturing and sale of its vehicles, particularly given Defendant's recognition as early as 2007 that engine immobilizers were an effective deterrent in preventing vehicle theft.

112.     Defendant was negligent in failing to monitor and guard against third-party misconduct and enabled such misconduct. In this case, a car thief was able to take advantage of the defective design and manufacture of the Kia Sportage manufactured, sold, and distributed by Defendant to steal the vehicle and then recklessly operate the same while fleeing from police. The resulting collision that caused injury to Plaintiff was the very type of incident that Defendant knew or, in the exercise of reasonable care, should have known would result from Defendant's decision to not manufacture its vehicles with industry-standard safety measures.

113.     Defendant acted unreasonably in light of what conduct could be foreseen as a result of its conduct and Defendant's negligence helped to and did produce, and was the direct

and proximate cause, of the physical, mental, and emotional injuries as well as the economic losses Plaintiff has suffered and will continue to suffer in the future.

114.     Defendant's acts and omissions imposed an unreasonable risk of harm to Plaintiff separately and/or combined with the negligent and/or criminal acts of third parties.

115.     Plaintiff's injuries, damages, and economic losses, both present and future, would not have occurred absent Defendant's negligent conduct described herein.

116.     As a direct and proximate result of Defendant's negligence, Plaintiff has been injured and has suffered economic loss and will continue to suffer such losses into the future. Plaintiff's damages include severe, catastrophic physical injuries, many of which are believed to be permanent in nature. Plaintiff has incurred substantial medical expenses for multiple surgeries, physical therapy, and other medical care. Plaintiff has suffered wage loss due to her inability to work. She has suffered a loss of enjoyment of life due to her numerous physical injuries and the mental and emotional trauma she has experienced and will continue to experience.

<div align="center">

FOURTH CAUSE OF ACTION
*Product Liability*

</div>

117.     Plaintiff incorporates  each of the preceding paragraphs as if fully rewritten herein.

118.     Defendant's vehicles, including the Kia Sportage that injured Plaintiff, were defective in their design and manufacture because the vehicles were produced without standard-industry safety measures.

119.     At all times relevant, Defendant Kia knew or, in the exercise of reasonable care should have known, that its decision to manufacture vehicles without industry-standard safety

features, including an engine immobilizer, as was the Kia Sportage that injured Plaintiff, that their vehicles posed an unreasonable risk of harm to Plaintiff and other members of the public.

120.   It was reasonably foreseeable to Defendant Kia that its vehicle would be stolen and operated recklessly by unauthorized drivers.

121.   Defendant's decision to design, manufacture and distribute vehicles without standard-industry safety measures, including the Kia Sportage that injured Plaintiff, made those vehicles far more likely to be stolen and present an unreasonable risk of harm to Plaintiff and other members of the general public.

122.   Indeed, a multitude of videos were posted on TikTok, YouTube, and other social media platforms, that touted the ease by which Defendant's vehicles could be stolen.

123.   Defendant's design and manufacture of vehicles, including the Kia Sportage that injured Plaintiff, without industry-standard safety measures failed to conform to applicable public standards, including standards promulgated by the NHTSA and FMVSS 114.

124.   There was no safety advantage to Defendant's design and manufacture of vehicles, including the Kia Sportage that injured Plaintiff, without industry-standard safety measures.

125.   When the defective vehicles left Defendant's control, including the Kia Sportage that injured Plaintiff, it was both technically and economically feasible for Defendant to incorporate industry-standard safety measures, such as an engine immobilizer. In fact, Defendant was manufacturing similar vehicles for other markets that were designed and manufactured with an engine immobilizer.

126.   Defendant Kia knew or, in the exercise of reasonable care should have known, that its vehicles, including the Kia Sportage that injured Plaintiff, would have been less dangerous had they been designed and manufactured with industry-standard safety measures, such as an engine immobilizer.

127.    As a direct and proximate result of Defendant Kia's design and manufacture of its vehicles, including the Kia Sportage that injured Plaintiff, without industry-standard safety measures, such as an engine immobilizer, Plaintiff suffered severe, catastrophic injuries. As a result of her injuries, Plaintiff has endured multiple surgical procedures. She has suffered physical pain, mental anguish, and emotional distress. She has sustained economic loss for her medical treatment and care and will continue to experience such loss in the future. Many of Plaintiff's injuries are believed to be permanent in nature. She has suffered a loss of income and enjoyment of life and will continue to experience such losses.

WHEREFORE, Plaintiff prays for judgment against Defendant Kia America, Inc., as follows:

A.    For compensatory damages in an amount in excess of $5,000,000.00;

B.    For punitive damages in an amount in excess of $10,000,000.00;

C.    For and award of prejudgment and post-judgment interest;

D.    For Plaintiff's reasonable attorney fees, costs, and litigation expenses; and

E.    For such other and further relief as this Court deems to be just and equitable.

*Respectfully Submitted,*

*s/ Joseph F. Scott*
Joseph F. Scott (0029780)
Ryan A. Winters (0086917)
SCOTT & WINTERS LAW FIRM, LLC
P: (216) 912-2221      F: (440) 846-1625
50 Public Square, Suite 1900
Cleveland, Ohio 44113
jscott@ohiowagelawyers.com
rwinters@ohiowagelawyers.com

Kevin M. McDermott II (0090455)
SCOTT & WINTERS LAW FIRM, LLC
P: (216) 912-2221      F: (440) 846-1625
11925 Pearl Rd., Suite 310
Strongsville, Ohio 44136
kmcdermott@ohiowagelawyers.com

*Attorneys for Plaintiff*

<u>**JURY DEMAND**</u>

Plaintiff hereby demands a trial by jury as to all issues presented.

*s/ Joseph F. Scott*

Joseph F. Scott (0029780)